**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANT:

**MARK W. FORD**
**THOMAS E. MIXDORF**
**BRANDI L. BENNETT**
**JENNY R. BUCHHEIT**
Ice Miller LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ELIZABETH ROGERS**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

DEBORAH L. DYSERT,          )
         )
    Appellant,          )
         )
    vs.          )     No. 93A02-1105-EX-392
         )
REVIEW BOARD OF THE INDIANA          )
DEPARTMENT OF WORKFORCE          )
DEVELOPMENT and THE INDIANA          )
SUPREME COURT,          )
         )
    Appellees.          )

APPEAL FROM DEPARTMENT OF WORKFORCE DEVELOPMENT
The Honorable Steven F. Bier, Chairperson
The Honorable George H. Baker, Member
The Honorable Lawrence A. Dailey, Member
Cause No. 11-R-1224

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

STATEMENT OF THE CASE

Deborah L. Dysert ("Dysert") appeals a determination by the Review Board of the Indiana Department of Workforce Development (the "Board").

We affirm.

ISSUE

Whether the Board erred in concluding that the Dysert's employer discharged her for just cause.

FACTS

Prior to the acts that led to Dysert's discharge on March 2, 2010, Dysert's employer, Dubois County Prosecutor Michael Fritch ("Fritch"), decided to run for Superior Court judge. Dysert, Fritch's chief deputy, filed to be a candidate for Fritch's position, as did deputy prosecutor Kurt Leinenbach ("Leinenbach"). Fritch did not openly endorse either deputy, which made Dysert unhappy because she was Fritch's chief deputy and had been in the prosecutor's office longer than Leinenbach. Fritch informed Dysert and Leinenbach that even though their participation in the upcoming political primary had the potential to result in tense working conditions, he expected them to act as

professionals. Fritch was aware of, but did not disapprove of, the active involvement of deputy prosecutor Christine St. John ("St. John") in Dysert's campaign.

Fritch's onsite staff was small, consisting of his three deputies and six office employees. As the Board found, Fritch and the three deputies were State employees whose primary salary and benefits were provided by the State. Fritch tried cases, with Leinenbach's assistance, in Circuit Court, where the cases generally were more complex, took longer to prepare and try, but were less numerous. Dysert and St. John tried cases in the county's single Superior Court, where cases generally were less complex but more numerous. St. John frequently stated her displeasure with the workload and believed that she was required to do more work than Leinenbach.

Fritch did not create his own written office policies and procedures, but he referred his employees to the "Dubois County Employee Policy and Procedures Handbook" (the "handbook") as a general guide. The handbook included provisions pertaining to vacations, attendance, reporting of complaints, whistleblower protection, and other employment-related matters. As the Board's findings indicate, Fritch followed the handbook "where it made sense as a guideline, but . . . he did not feel confined by the procedure as to himself or the deputy prosecutors, since they were not County employees." (Tr. Ex. p. 199). Specifically, the handbook indicated that "[t]his entire policy does not apply to employees who are compensated solely or partially from Federal or State funds and whose benefits or duties are determined elsewhere." (Tr. Ex. p. 151).

3

Nevertheless, when the handbook was revised in January of 2010, the deputy prosecutors, including Dysert, were required to acknowledge receipt thereof.

At some point, Fritch purchased a computer program to help monitor attendance. He originally required the deputies and office employees to "clock in and out" by using the program, but prior to 2010, he determined that the system was unsuitable for the deputies who spent much of their work time in court or in off-site investigations and depositions. Fritch, who had forgotten that he had given the password to the computer program to Dysert, believed that he was the only one who could access the program. In 2009, after problems arose with the program, he told his deputies and office employees that they would be subject to discharge if they accessed the program without his permission.

In June of 2009, St. John began to question whether Leinenbach was accurately reporting the time he worked. She met with Fritch to communicate her belief. Fritch, who generally knew Leinenbach's schedule because they worked together in the Circuit Court, followed up after the meeting but found no wrongdoing.

In January of 2010, St. John again reported her belief to Fritch, who responded by asking Leinenbach to present written attendance records. Thinking that Fritch was non-responsive to her demand for a more extensive investigation, St. John reported her belief to Dysert on or about the last day of January 2010. Dysert "jumped up and said we are gonna go to [Fritch] . . . ." (Tr. 98).

4

On February 1, 2010, Fritch spent the day trying a rape case. He returned to the office around 5:30 p.m. and was confronted by Dysert and St. John. Fritch acceded to Dysert's and St. John's demands that he meet with them to discuss Leinenbach's attendance and workload, even though it was customary that a prosecutor involved in a big case be left alone to try the case without distraction. Dysert and St. John secretly recorded the meeting and demanded that Fritch begin an immediate investigation of Leinenbach. Fritch promised to investigate after the conclusion of the rape trial, and he requested that Dysert and St. John provide him with copies of the paperwork that they said would prove their claims. Dysert and St. John refused to provide him with copies or show any paperwork to Fritch and stated that the burden of proof was now on Leinenbach. They became angry with Fritch when he suggested that he would have the State Board of Accounts come in after the rape trial to check the office records and to advise him about recordkeeping. They then accused Fritch of discriminating against them by invoking an investigation that would include the review of their attendance records as well. They were further angered when Fritch refused to make accusations against Leinenbach solely based upon their investigation. Fritch reminded them that St. John had incorrectly reported in June of 2009 that Leinenbach had lied about attending a deposition after she had called the wrong court to verify his presence at the deposition. Fritch stated that it was not too much to ask that the investigation be done correctly after

5

he finished his trial. He assured Dysert and St. John that he was not "putting this off until the primary [election]." (Exhibit 7, Disc of the February 1, 2010 Meeting).

As the meeting progressed, Fritch, Dysert, and St. John discussed accessibility to the computer program, and Dysert stated her desire to retrieve Leinenbach's pre-2010 attendance records. Fritch told Dysert and St. John that he was the only one with a password to the program and that he did not want anyone to know the password or enter the program outside his presence. After Dysert asserted that she wanted to enter the program to research Leinenbach's attendance records, Fritch asked Dysert whether she had the password. Dysert said, "I don't have the password." (Ex. 7, Disc of February 1, 2010 Meeting). Dysert then asserted that the program could be accessed without a password, and Fritch, Dysert, and St. John went to the computer. Dysert managed to access the program and stated her desire to print Leinenbach's pre-2010 attendance records. Fritch, who needed to continue his trial preparation, ordered Dysert not to print the records until after the trial. He reminded Dysert that Leinenbach was her political opponent and that Fritch needed to be present, as protection for both Dysert and Leinenbach, to verify that the computer records were not altered. After Fritch left the office, Dysert printed Leinenbach's records and gave them to St. John. St. John then gave the records to the Janet Sendelweck, the County Auditor.[1]

---

[1] Ironically, Sendelweck, at St. John's insistence, arranged for an investigation by the State Board of Accounts. The State Board of Accounts later conducted an investigation and found no wrongdoing by Leinenbach.

On February 10, 2010, Fritch met with Dysert and asked her why she lied about the password. Dysert responded that she wanted to test Fritch's commitment to an investigation. On February 12, 2010, Fritch met again with Dysert and asked her a second time why she lied about the password. Dysert again responded that she wanted to test Fritch. Dysert was suspended on February 12, 2010, for lying to Fritch and for printing the records after being told not to do so.

On the same day, Fritch sent a letter to the County Commissioners advising them of Dysert's suspension for lying and for acting "in direct defiance of an express order." (Tr. Ex. p. 152). The letter also requested approval to discharge Dysert, and the Commissioners informed him, as they had on at least one other occasion, that they had no jurisdiction to interfere with Fritch's authority, as Fritch's employees were not County employees under the handbook.

On March 2, 2010, Fritch hand delivered a letter to Dysert that noted the County Commissioners' lack of jurisdiction. The letter then stated in pertinent part:

> [Y]ou are hereby notified that I am withdrawing my request to the Dubois County Board of Commissioners dated February 12, 2010 requesting approval of my decision to terminate your employment.
>
> You are further notified that your employment is terminated immediately for the reasons set forth in the written charges addressed to you dated February 12, 2010, conduct which I view as a breach of my confidence in your judgment, loyalty, and cooperativeness in carrying out my policies and responsibilities of my office.

7

(Tr. Ex. p. 153). [2]

Dysert subsequently applied for unemployment compensation. A hearing deputy determined that Dysert was not discharged for just cause, and that there was "[n]o disqualification" for compensation. (App. 8). The State appealed, and a hearing was held before an Administrative Law Judge ("ALJ"). The ALJ found that Dysert was a State employee paid by the State who functioned on the county level. The ALJ also found that Dysert "was terminated on March 2, 2010, for lying to the prosecutor about having the password [to the computer attendance program] and running copies of the time records in the computer after being told not to." (Tr. Ex. p. 201). The ALJ concluded that Dysert was discharged for just cause pursuant to Indiana Code section 22-4-15-1(d)(9), which defines "discharge for just cause" to include but not be limited to: "any breach of duty in connection with work which is reasonably owed an employer by an employee." *Id*. The Board adopted the ALJ's findings and determination as its own.

DECISION

Dysert does not contest the Board's determination that she lied to Fritch and disobeyed his direct order that she not print Leinenbach's password-protected attendance records outside Fritch's presence. Furthermore, Dysert does not contest the Board's determination that these acts fall within the definition of "discharge for just cause" under Indiana Code section 22-4-15-1(d)(9). Rather, Dysert contends that the Board's decision

---

[2] The letter containing the written charges referred to in the March 2, 1010 letter is not in evidence. There is no dispute, however, that the charges referred to lying and insubordination.

should be overturned because she was denied the protections to a whistleblower provided in the handbook. She also contends that she was denied the protection of the handbook provision stating that discharge of a County employee was subject to the approval of the County Commissioners.

When the Board's decision is challenged as contrary to law, we inquire as to (1) the sufficiency of the facts found to sustain the decision, and (2) the sufficiency of the evidence to sustain the findings of fact. *McClain v. Review Bd. of the Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1317 (Ind. 1998); Ind. Code § 22-4-17-12(f). Under this standard, we will review (1) determinations of specific or "basic" underlying facts; (2) conclusions or inferences from those facts, sometimes called "ultimate facts"; and (3) conclusions of law. *Id.* We review the Board's findings of basic fact under a "substantial evidence" standard. *Id*. Under this standard, we neither reweigh the evidence nor assess the credibility of witnesses. *Id*. Indeed, we consider only the evidence most favorable to the Board's findings. *Id*. We will reverse the Board only if there is no substantial evidence to support its findings. *Id*.

The Board's conclusions regarding "ultimate facts" involve an inference or deduction based on the findings of basic fact, and are typically reviewed to ensure that the Board's inference is "reasonable" or "reasonable in light its findings." *Id*. at 1317-18. Questions of ultimate fact are essentially mixed questions of law and fact. *Id*. at 1318. We are not bound by the Board's interpretation of the law, however, and will determine

9

de novo whether the Board correctly interpreted and applied the applicable law. *Szymanski v. Review Bd. of the Ind. Dep't of Workforce Dev.*, 656 N.E.2d 290, 292 (Ind. Ct. App. 1995).

We first turn to Dysert's argument that she was denied the protections provided for whistleblowers under the handbook. As Dysert acknowledges, the protections set forth in the handbook track those provided to all State workers in Indiana Code section 4-15-10-4, which provides that a whistleblower acting in good faith may not be dismissed, transferred, reassigned, denied promotion, demoted, denied salary increases, or deprived of employment-related benefits. In other words, as the handbook states, a whistleblower acting in good faith "will not be subject to any retaliation as a result of bringing the suspected misconduct forward." (Tr. Ex. p. 176).

We would be compelled to reverse if Dysert was discharged in retaliation for exercising her rights and duties as a whistleblower. However, our review of the Board's findings and conclusions, along with the record upon which they are based, discloses that Dysert was not discharged because she was a whistleblower acting in good faith. She was discharged because she lied to Fritch, her immediate supervisor, and because she refused to follow Fritch's clear directive that she wait until he was present before printing Leinenbach's privacy-protected attendance records. The evidence in favor of the Board's determination does not indicate that there was any legal, ethical, or reasonable consideration which would cause Dysert to disregard either Fritch's order to wait until

10

the end of trial or his directive that he be present to protect the integrity of the process when the records were printed. Time was not of the essence, and the evidence shows that Dysert's lie and insubordination were neither necessary nor protected behavior. In short, Fritch did not retaliate against a whistleblower acting in good faith. Instead, he discharged an employee who, for reasons of her own, knowingly lied to Fritch and intentionally disregarded his instructions.

We now turn to Dysert's contention that she was denied the protection of the handbook provision stating that any recommendation of discharge by a supervisor of a Dubois County employee "shall be subject to the approval of the Board of Commissioners." (Tr. Ex. p. 174). The handbook specifically states that the "entire policy" contained therein does not apply to employees, like Dysert, who are partially compensated from State funds and whose benefits or duties are determined elsewhere.[3]

---

[3] As noted above, the handbook states:

> These policies and procedures apply to all Dubois County ("County") employees, except when in conflict with special employment conditions set forth for elected officials or when in conflict with various statutes governing employment relationships.

> This entire policy does not apply to employees who are compensated solely or partially from Federal or State funds and whose benefits or duties are determined elsewhere.

(Tr. Ex. p. 151).

Dysert argues that the "benefits" referred to in the second paragraph must be in conflict with those provided under the handbook to county employees. Dsyert asserts that this reading is the only interpretation that gives meaning to both paragraphs. We disagree. The second paragraph is a more specific statement than the first. Under the paragraph, Dysert was a State employee partially paid by the

11

Although it is clear that Fritch adopted parts of the handbook and that Dysert should be given those protections that arguably apply to any employee working under the handbook, it is also clear that Fritch's adoption of the handbook was not the equivalent of a wand that magically created jurisdiction for the County Commissioners where none existed. As the County Commissioners realized from the start, and Fritch came to realize before March 2, 2010, the handbook did not require Fritch to obtain the Commissioners' imprimatur before discharging Dysert for lying and insubordination.[4] Accordingly, Dysert was not deprived of any applicable handbook provision.

## CONCLUSION

The Board did not err as a matter of law in not finding that Dysert was deprived of any applicable handbook protections. Furthermore, the Board did not err in determining, whether as a matter of law or fact, that Dysert was terminated for just cause.

Affirmed.

BAKER, J., and BAILEY, J., concur.

---

State whose benefits, though consonant with the benefits provided under the handbook, were determined and provided by the State.

[4] To be sure, Fritch was on more than one occasion confused as to whether Dysert was terminated according to the provisions of the handbook. Even if the handbook applied, however, it did not provide protection for lying and insubordination. These actions are those which are described in *Hehr v. Review Board*, 534 N.E.2d 1122, 1126 (Ind. Ct. App. 1989), as "of such a nature that a reasonable employee of the employer would understand that the conduct in question was in violation of a duty owed to the employer and that [s]he would be subject to discharge for engaging in the activity or behavior."

12